[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 261.]

THE STATE OF OHIO, APPELLEE, *v*. LAZZARO, APPELLANT.

[Cite as *State v. Lazzaro*, 1996-Ohio-397.]

*Criminal law—Falsification—Obstructing official business—Making unsworn false oral statement to public official with purpose to mislead, hamper, or impede investigation of a crime is punishible conduct within meaning of R.C. 2921.13(A)(3) and 2921.31(A).*

The making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A). (*Columbus v. Fisher* [1978], 53 Ohio St.2d 25, 7 O.O.3d 78, 372 N.E.2d 583, and *Dayton v. Rogers* [1979], 60 Ohio St.2d 162, 14 O.O.3d 403, 398 N.E.2d 781, overruled.)

(No. 95-647—Submitted March 20, 1996—Decided August 7,1996.)

APPEAL from the Court of Appeals for Lorain County, No. 94CA005885.

———————————

{¶ 1} On October 7, 1993, Noel Neece and Julie Swindell, who are employed as nurse's aides by the Good Samaritan Nursing Home, were assisting a resident, Carl Newman, at the toilet when an argument erupted between Neece and Newman, resulting in Neece punching and breaking Newman's nose. Charlotte Lazzaro, then administrator of the nursing home, was notified of the incident and immediately conducted an initial investigation by separately questioning the two nurse's aides.

{¶ 2} Lazzaro began by talking with Swindell, who told Lazzaro that Neece had intentionally struck Newman. Swindell also gave Lazzaro a written statement describing the assault. Lazzaro then permitted Swindell to leave for the day.

**{¶ 3}** Next, Lazzaro questioned Neece. Neece's depiction of the events differed markedly. According to Neece, he had struck Newman accidentally while putting his arm up to defend himself. Lazzaro then wrote down Neece's description of the event, and he signed the statement. Although Neece's shift had ended, Lazzaro detained him so the police could question him.

**{¶ 4}** Lazzaro contacted the Avon Police Department and requested that an officer be sent to investigate the incident. According to Officer Michael Kish, when he arrived at the nursing home, he spoke first with Lazzaro, who told him that she had an employee who had struck a resident, but that the employee had described it as an accident. When Kish asked Lazzaro if anyone witnessed the incident, she responded that no one had. Lazzaro, however, denies that she ever had this initial conversation with Kish.

**{¶ 5}** Kish then questioned Neece regarding the injury to Newman. Neece maintained his story that the assault had been an accident. Although Lazzaro was present during Neece's entire explanation and demonstration of the incident, at no time did Lazzaro tell Kish about the existence of a contradictory witness, nor did she provide him with Swindell's written statement describing the incident as an intentional assault. After investigating the incident for approximately one-half hour, Kish informed Lazzaro that there appeared to be no criminal act and left the nursing home.

**{¶ 6}** Four days later, Lazzaro again called the Avon police. By this time, she had learned that Kish had filed his report concluding that Neece had struck Newman accidentally. She had also learned that the full extent of Newman's injuries consisted of a broken nose and visible facial bruising. In her call to the police, Lazzaro indicated that new evidence had come to light suggesting that Neece had intentionally struck Newman. When Kish returned the call two days later, Lazzaro, for the first time, also suggested that the police talk to Swindell.

2

**{¶ 7}** Aided by the new information, the Avon police reopened the investigation and, ultimately, arrested Neece. Neece admitted that he had intentionally struck Newman, and eventually pled guilty to felonious assault.

**{¶ 8}** Subsequently, Lazzaro was charged with obstructing official business, falsification, and obstructing justice. After a trial to a jury, she was found guilty of obstructing official business and falsification. Following this court's decision in *State v. Bailey* (1994), 71 Ohio St.3d 443, 644 N.E.2d 314, the Ninth District Court of Appeals affirmed the convictions and sentence.

**{¶ 9}** This cause is now before this court upon the allowance of a discretionary appeal.

_____

*Gregory A. White,* Lorain County Prosecuting Attorney, and *Jonathan Rosenbaum*, Assistant Prosecuting Attorney, for appellee.

*Gold, Rotatori & Schwartz Co., L.P.A., Gerald S. Gold* and *John S. Pyle*, for appellant.

_____

**MOYER, C.J.**

**{¶ 10}** This case presents the court with the question of whether the making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A). For the following reasons, we answer that question in the affirmative.

**{¶ 11}** At trial, Lazzaro was found guilty of violating R.C. 2921.13, Ohio's falsification statute, which provides:

"(A) No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:

"***

"(3) The statement is made with purpose to mislead a public official in performing the public official's official functions."

**{¶ 12}** Lazzaro was also convicted of obstructing official business under R.C. 2921.31(A), which provides:

"(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties."

**{¶ 13}** Lazzaro relies on our holdings in *Columbus v. Fisher* (1978), 53 Ohio St.2d 25, 7 O.O.3d 78, 372 N.E.2d 583, and *Dayton v. Rogers* (1979), 60 Ohio St.2d 162, 14 O.O.3d 403, 398 N.E.2d 781, where we held that the making of unsworn false oral statements to a police officer was not punishable conduct with the meanings of R.C. 2921.13(A)(3) or 2921.31(A), respectively.

**{¶ 14}** In *Fisher*, the defendant was convicted of violating a municipal ordinance virtually identical to R.C. 2921.13(A)(3) for giving a false name to a police officer. The *Fisher* court reviewed the history of the statute, and adopted the reasoning that for a false statement to be punishable it must be in writing and must also derive from an intent to mislead.

**{¶ 15}** In *Rogers*, the defendant was convicted of violating a Dayton municipal ordinance identical to R.C. 2921.31(A) for lying to a police officer by falsely confirming the identity of her companion. Relying on the reasoning in *Fisher*, the *Rogers* court concluded that because "conduct such as appellant's is not punishable under R.C. 2921.13(A)(3), which specifically addresses the making of false statements to public officials, we are reasonably led to the determination here not to extend the meaning of R.C. 2921.31 beyond that intended by the General Assembly." *Rogers*, *supra*, 60 Ohio St.2d at 164, 14 O.O.3d at 404-405, 398 N.E.2d at 783.

**{¶ 16}** The holdings in *Fisher* and *Rogers* were expressly limited to their facts by this court's recent decision in *State v. Bailey* (1994), 71 Ohio St.3d 443, 644 N.E.2d 314. In *Bailey*, the defendant was convicted under R.C. 2921.32(A)(5) for obstructing justice when she continually refused to move from the doorway of the house, thereby blocking the police from entering the house to arrest her brother, and repeatedly declared that her brother was not home. In *Bailey* we observed that both state and federal case law have "firmly established that unsworn false oral statements made for the purpose of impeding an officer's investigation are punishable ***." (Citations omitted.) *Id.* at 446, 644 N.E.2d at 316. We held at the syllabus that "[t]he making of unsworn false oral statements to a law enforcement officer with the purpose to hinder the officer's investigation of a crime is punishable conduct within the meaning of R.C. 2921.32(A)(5)."

**{¶ 17}** In view of our recent decision in *Bailey*, we conclude that Lazzaro's reliance on *Fisher* and *Rogers* is misplaced. Although *Bailey* did not overrule those cases, it did limit them to their facts, as the specific statutes involved in each were not directly before this court at that time. However, both R.C. 2921.13(A)(3) and 2921.31(A) are the subject of review in the instant case, and we conclude that the sound reasoning expressed in *Bailey* applies equally to both statutes.

**{¶ 18}** Lazzaro argues that it would be an improper retroactive application of our decision in *Bailey* to the facts at bar because *Bailey* was not announced until after Lazzaro's convictions, but before review of the case by the court of appeals. We disagree. "The general rule is that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former was bad law, but that it never was the law." *Peerless Elec. Co. v. Bowers* (1955), 164 Ohio St. 209, 210, 57 O.O 411, 129 N.E.2d 467, 468.

**{¶ 19}** Lazzaro also argues that the doctrine that mere exculpatory denials cannot be punished should apply to her responses to Kish. See *Columbus v. New* (1982), 1 Ohio St.3d 221, 1 OBR 244, 438 N.E.2d 1155. But, see, *United States v.*

*Steele* (C.A.6, 1991), 933 F.2d 1313, 1320. However, this doctrine does not extend to the facts in the present case because the questions asked by Kish of Lazzaro did not implicate her Fifth Amendment protections against self-incrimination. Accordingly, we make no decision regarding its applicability to the statutes reviewed.

{¶ 20} The record indicates that Lazzaro embarked upon a course of conduct aimed at limiting the police investigation in such a way that the assault on Newman would be ruled accidental. One way was by allowing the only witness to the assault, Julie Swindell, to leave work without speaking to Kish. Neece testified that when he talked with Lazzaro soon after the assault, she told him that she had already taken Swindell's statement, and that Swindell would not be talking to the police. This suggests that Lazzaro did not merely passively fail to assist Kish's investigation, but actively chose which witnesses Kish would encounter. Lazzaro furthered the concealment of this key witness by denying her existence. Specifically, when Kish testified at trial, he stated:

"A    I asked [Lazzaro] if there was [*sic*] any witnesses, and she said no.

"Q    Are you sure of that?

"A    I'm positive.

"Q    And her response was what?

"A    That there wasn't any."

{¶ 21} Kish also testified that Lazzaro was present during Neece's entire explanation of the assault:

"Q    And Mrs. Lazzaro was present during this entire presentation?

"A    That is correct.

"Q    And demonstration?

"A    That's right. He demonstrated it next.

"Q    Did she ever tell you she had conflicting information to that report?

"A    No, she did not.

"* * *

"Q    Did you make efforts again to ascertain if there were any possible witnesses?

"A    Yes, I did.  Before I released Mr. Neece I asked Mr. Neece also if there were any witnesses, and he said no.

"Q    In Mrs. Lazzaro's presence?

"A    In Mrs. Lazzaro's presence.  ***

"* * *

"Q    At any time did anyone say there's another witness to see, maybe your decision [of no criminal act] is a little hasty?

"A    No, they did not."

{¶ 22} There can be no doubt that the statements and actions of Lazzaro conveyed false information regarding the existence of another witness and the possibility of a criminal act.  A trier of fact could reasonably conclude from the evidence that Lazzaro intended to mislead and impede the investigation conducted by Kish.

{¶ 23} The General Assembly has adopted legislation intended to discourage individuals from purposely giving false information that hinders public officials in the performance of their duties.  Complete and honest cooperation with the law enforcement process by all citizens is essential to the effective operation of the justice system.  *Columbus v. New* (1982), 1 Ohio St.3d 221, 227, 1 OBR 244, 249, 438 N.E.2d 1155, 1160. Therefore, we hold that the making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A).  Our decisions in *Columbus v. Fisher* and *Dayton v. Rogers* are hereby overruled.

{¶ 24} For the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

RESNICK, COOK and STRATTON, JJ., CONCUR.

COOK and STRATTON, JJ., concur separately.

F.E. SWEENEY and PFEIFER, JJ., dissent.

DOUGLAS, J., not participating.

———————————

**STRATTON, J., concurring.**

{¶ 25} I concur in the majority opinion. There does not seem to be any dispute over the law, but rather how the law applies to these facts. Was Lazzaro merely confused about her conflicting duties, as the dissent alleges, or was she trying to hide patient abuse to protect her nursing home, as the jury found? Did she call the police again because she realized a discrepancy, or because she knew the facts were about to come out? The jury was in the best position to weigh credibility (both hers and Officer Kish's), to judge motive, and to decide whether the evidence supported the charge beyond a reasonable doubt that Lazzaro *intended* to impede the investigation. Therefore, since the weighing of the evidence is the real issue here, and the evidence can clearly be read as the jury found, I would affirm the court of appeals and the jury's conclusions.

COOK, J., concurs in the foregoing concurring opinion.

———————————

**FRANCIS E. SWEENEY, SR., J., dissenting.**

{¶ 26} I respectfully dissent. I disagree with the majority's decision to affirm the appellant's convictions for obstructing official business (R.C. 2921.31[A]) and falsification (R.C. 2921.13[A][3]). I believe the General Assembly never intended to criminalize the situation which occurred here. Therefore, I would reverse the court of appeals' decision, which affirms the appellant's convictions.

8

**{¶ 27}** In reaching my decision, I carefully considered the evidence presented at trial. According to this evidence, it was appellant who summoned the police to the nursing home on October 7, 1993. The police dispatch tape recorded her telephone conversation, where she stated: "I have an employee that -- well, I have a resident that has a bloody nose and *an employee I suspect of punching him in the nose*." (Emphasis added.) In response to appellant's call, Patrolman Michael Kish reported to the nursing home to investigate. This investigation lasted a total of thirty-two minutes, when Kish left his cruiser to when he re-entered it to leave the scene. Only ten minutes of his investigation was spent talking to the suspect, Noel Neece, Jr., and appellant.

**{¶ 28}** When interviewed by Kish, Neece stuck to his original story that it was an accident. Appellant knew that another nurse's aide, Julie Swindell, had given conflicting statements; however, appellant did not know at the time what had really occurred. Appellant had just received the report of this incident about one hour beforehand, and she was in the process of collecting information so she could reach her own determination of what had occurred. Appellant also stated that she was overwhelmed and had "tunnel vision" because she did not know what her responsibilities were to the patient, the nursing home, the witness, and the suspect. Therefore, appellant did not volunteer Swindell's name. In addition, she testified that Kish never asked her if there were any witnesses. Instead, the officer only asked whether the patient had a roommate, to which she replied "yes." Of course, Patrolman Kish's testimony differs from appellant's. Kish testified that he asked appellant if there were other witnesses, and she said "no." Kish also testified that he asked if the patient had a roommate.

**{¶ 29}** Before leaving the nursing home, Kish told appellant he did not think a criminal act had occurred. However, he told appellant to call him if it was later determined that the patient's nose was broken.

**{¶ 30}** The next day, Friday, October 8, 1993, appellant began preparing her report concerning the incident for the State Department of Health. In her seven years as the administrator, this was the first time she had dealt with a case of physical patient abuse. In connection with preparing her report, appellant learned the extent of the patient's injury and obtained a copy of Kish's police report. After considering all the information, appellant concluded that Neece had intentionally struck the patient. Her report to the state, which she sent on October 11, 1993, reflects her conclusion that patient abuse had occurred.

**{¶ 31}** After reaching this conclusion, appellant realized that the police report and her report to the state were conflicting. She did not want to make the police officer look ridiculous, and she realized that Kish had reached his conclusions because he did not know that the patient's nose was broken or that Swindell had offered a different version from the suspect's version. After speaking with the head of night security at the nursing home (an off-duty sergeant for the Avon police) on October 11, 1993, appellant called the police station to give Kish this new information. As a result of appellant's disclosure, the case was reopened and Neece was arrested for assaulting the patient and ultimately pled guilty to that charge.

**{¶ 32}** Based upon these facts, appellant was convicted of obstructing official business (R.C. 2921.31[A]) and falsification (R.C. 2921.13[A][3]). In order to sustain a conviction for obstructing official business, the state was required to prove, *inter alia*, that appellant (1) performed any act which hampered or impeded a public official in the performance of his lawful duties, and (2) with *a purpose* to prevent, obstruct, or delay performance by a public official of any authorized act within his official capacity. (Emphasis added.) To prove falsification, the state was required to show that appellant (1) *knowingly* made a false statement, (2) *with purpose* to mislead public official in performing his official function. (Emphasis added.)

**{¶ 33}** At oral argument, the prosecutor admitted that the state had to prove appellant's intent in committing these crimes. Further, the prosecutor conceded, despite all the legal rhetoric in his appellee brief to the contrary, that the only evidence he had to prove this intent was Patrolman Kish's testimony that appellant stated in response to his inquiry that there were no witnesses. The prosecutor then argued that if Kish's testimony was true, then intent could be inferred from appellant's oral statement. This was the sum and substance of the evidence the state produced to prove appellant guilty of these charges. In my mind, this evidence, which was disputed, is wholly inadequate to prove these crimes.

**{¶ 34}** Instead, the evidence clearly shows that appellant was confused and did not know what her responsibilities were when confronted with the police investigation. This confusion is understandable. As the administrator of the nursing home, she was faced with the task of knowing, understanding and juggling her responsibilities to the patient, nursing home, employees of the nursing home, and governmental authorities. Nevertheless, appellant discharged her duties under the law. She immediately reported the incident to the police, suspended the suspected wrongdoer, and proceeded to prepare her report to the Department of Health.

**{¶ 35}** After she digested all the information, she arrived at her conclusion that Neece had intentionally struck the patient. This conclusion was recorded in her state report. Because of her concern that her report and the police report did not match, she initiated contact with Patrolman Kish to provide him with all the information she had. She had no legal responsibility to do so. It was not her job to do the investigation for the police. Her only legal obligation was to report a suspected crime, which she did on October 7. However, solely based upon her voluntary actions, Neece was arrested for his crime and charged accordingly. Justice prevailed when Neece entered his guilty plea.

{¶ 36} I am at a loss to understand why the majority wants to punish appellant's actions. By upholding criminal convictions under these facts, I am afraid that today's decision today will have a far-reaching impact on every conversation between a law enforcement officer and a private citizen. Faced with the very real threat of criminal prosecution if an oral statement is later corrected, a citizen may very well be discouraged from providing any information to the police. In other words, the police, who already have a difficult job in ferreting out crime, have just been dealt a blow to their ability to combat crime. Instead, I believe the goal of obtaining accurate information about criminal misconduct can best be served by shielding from prosecution witnesses who voluntarily come forward to correct a police officer's misunderstanding about the case. Accordingly, I would reverse appellant's convictions.

PFEIFER, J., wholeheartedly concurs in the foregoing dissenting opinion.

_____