The STATE of Ohio, Appellee,

v.

MELTON, Appellant.

[Cite as *State v. Melton* (2001), 141 Ohio App.3d 713.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000156.

Decided March 9, 2001.

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Thomas J. Boychan, Jr.*, Assistant Prosecuting Attorney, for appellee.

*Jonathon P. Dameron*, for appellant.

PAINTER, Presiding Judge.

Appellant James Melton was convicted of two counts of felonious assault and one count of domestic violence for the beating of his live-in girlfriend. The counts were merged for purposes of sentencing, and the trial court imposed the maximum prison term of eight years. Melton raises six assignments of error in this appeal. His first and third assignments challenge the sufficiency of the evidence supporting his convictions. His second assignment challenges the weight of the evidence. In his fourth assignment, Melton contends that the trial court improperly limited his cross-examination of the state's witnesses. Melton argues in his fifth assignment that the trial court made improper evidentiary rulings. And, in his last assignment, Melton contends that the trial court erred by imposing the maximum prison term.

Following a night of heavy drinking at a bar with Melton and others, Melton's girlfriend returned alone to their apartment. (Melton and his girlfriend had an altercation at the bar, where Melton slapped her.) Sometime in the early morning hours, Melton returned and entered the apartment through a window. Over a period of time, he beat his girlfriend with a wooden pole and sections of curtain rods. An upstairs neighbor testified that he had heard the domestic

dispute and the victim screaming, "Somebody please call 911, he's going to kill me." Sometime later, the victim knocked on the neighbor's door, badly beaten and wearing only a towel, and asked to use his telephone to call 911. According to the neighbor, she was crying and upset. She told the neighbor that her boyfriend had broken the legs off a coffee table and beat her with them. The victim called 911 and told the dispatcher that her boyfriend had beaten her.

A Cincinnati police officer on the scene testified that the victim was crying and hysterical, very angry, and very scared. The victim's face was swollen, and she had a cut on her eye. The victim was wrapped in a curtain or a sheet. The victim said that Melton had awakened her when he came through the window and that he began beating her with a curtain rod and a table leg. The victim told the officer that the beating had lasted for two or three hours. The officer accompanied the victim to the hospital, where she continued to be "very hysterical."

Before going to the hospital, the officer viewed the apartment and saw the open window, overturned furniture, a coffee table with a broken leg, and a broken glass table. Melton was passed out in the back of the apartment with a cut on his hand and blood covering his body. After the victim identified Melton as her assailant, the police arrested him and read him his *Miranda* rights. Melton claimed that three girls had followed the victim home and beaten her. Meanwhile, another officer collected evidence from the apartment, including a portion of a table leg and sections of a curtain rod, all of which had blood on them.

A Cincinnati fire lieutenant/paramedic testified that the victim had been alert and oriented and did not report being unconscious at any time. He testified that it was important for him to know the circumstances surrounding an injury in order to determine treatment. He asked the victim what had occurred, and she responded that she had been beaten over a period of five or six hours by her boyfriend with his fists, a table leg, and a curtain rod. The paramedic described the victim's injuries. Because of the severity of the injuries, the paramedics called a physician while in transit to the hospital to determine appropriate treatment.

The victim testified that the only memory she had of the beating was awaking and seeing that Melton was upset with her. She testified that he had hit her multiple times. She then passed out or lost consciousness. The next thing she remembered was being upstairs, where she asked to use her neighbor's telephone to call 911. She testified that Melton had hit her numerous times that night, but she could not recall the duration of the beating. She testified that her head was "split," that her eyes were swollen shut, and that she was covered with bruises. She had four staples in the front of her head and two different cuts with staples in the back of her head. She also sustained a scar on her shoulder. Pictures of the victim taken that morning verified the injuries she described.

Before trial, the victim sent letters to the prosecutor and to defense counsel stating that Melton had not beaten her. In the letters, she claimed that three unidentified girls who had followed her home beat her. On the stand, she testified that the letters were untrue, and that she had written them because she loved Melton and did not want him to go to jail.

Melton testified that he arrived home at approximately 6:45 a.m., and crawled through the window because the door was locked. He cut his hand on a piece of glass where the window was broken. Melton did not know when he returned to the apartment whether his girlfriend had returned home. The next thing he remembered was the police pointing a gun at him. Melton denied being intoxicated. He denied telling the police officer about the three girls. He denied hitting his girlfriend with a pole or curtain rod. He described the pole found at the scene as a leg from a bar stool that he had found and kept. (The victim testified that the pole was not a leg from her coffee table, and that she had never seen the pole before.) Melton admitted slapping or pushing the victim at the bar.

The victim was recalled during the presentation of Melton's defense and stated that she was testifying because the police had threatened to put her in jail if she did not do so. The trial court sustained the state's objection and struck the victim's answer concerning what the police had said to her. It also sustained objections to two other questions concerning what the officers had said. The victim was allowed to testify that she was appearing in court because she felt threatened.

## I. Sufficiency and Weight of the Evidence

In support of his first three assignments, Melton argues that because the victim testified that she had been too drunk to remember what occurred that night, her statements to the paramedic, the neighbor, and the police officer were not credible. He also argues that the letters she sent, which, she testified, contained false statements, served to lessen her credibility. Last, he questions the failure of the police to verify that the blood on the pole and the curtain-rod sections belonged to the victim, in light of the fact that Melton testified that he had cut himself.

■ Although Melton raises two assignments questioning the sufficiency of the evidence to support his convictions, his arguments support only his assignment regarding the weight of the evidence. Weight of the evidence and sufficiency of the evidence are "both quantitatively and qualitatively different."[1] This court has explained that "[t]o reverse a conviction for insufficient evidence, an appellate court, reviewing the evidence in the light most favorable to the prosecution, must

---

1. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546.

conclude that no reasonable trier of fact could have found the defendant guilty." [2] In contrast, "[i]n reviewing a manifest-weight issue, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." [3] "Weight is not a question of mathematics, but depends on its effect in inducing belief." [4]

■ The applicable statutes in this case required that the state prove beyond a reasonable doubt that Melton had knowingly caused serious physical harm to the victim [5] or knowingly caused or attempted to cause physical harm to the victim by means of a deadly weapon. [6] To prove domestic violence, the state had to show beyond a reasonable doubt that Melton had knowingly caused or attempted to cause physical harm to a household member. [7] The evidence, when viewed in a light most favorable to the state, clearly supported Melton's convictions for felonious assault and domestic violence.

■ Melton also raises as a sufficiency claim the trial court's overruling of his Crim.R. 29 motion. Because Melton's attorney failed to renew the motion at the close of all the evidence in a jury trial, Melton waived any error committed in overruling his motion. [8] Even assuming that Melton had preserved this issue for appeal, we conclude that the trial court did not err because the evidence was such that reasonable minds could reach different conclusions as to whether each element of the charged offenses had been proved beyond a reasonable doubt. [9]

Upon applying the manifest-weight standard to the evidence, we also conclude that the jury did not lose its way and create such a manifest miscarriage of

---

2. See *State v. Pies* (Dec. 17, 1999), Hamilton App. Nos. C–990241 and C–990242, unreported, 1999 WL 1203804, citing *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

3. See *id.*, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720.

4. See *State v. Thompkins* at 387, 678 N.E.2d at 546, quoting Black's Law Dictionary (6 Ed.1990) 1594.

5. R.C. 2903.11(A)(1).

6. R.C. 2903.11(A)(2).

7. R.C. 2919.25(A).

8. See *State v. Coleman* (Aug. 20, 1999), Hamilton App. No. C–980617, unreported, 1999 WL 632926, citing *Dayton v. Rogers* (1979), 60 Ohio St.2d 162, 14 O.O.3d 403, 398 N.E.2d 781, overruled on other grounds in *State v. Lazzaro* (1996), 76 Ohio St.3d 261, 667 N.E.2d 384.

9. See *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

justice that a new trial is required. The jury was entitled to "believe or [to] disbelieve any witness or accept part of what a witness says and reject the rest."[10] The jury obviously believed the victim's testimony that the letters were fabrications, that she loved Melton and did not want him to be incarcerated, and that Melton had beaten her until she passed out or became unconscious. This is not an exceptional case in which the evidence weighs heavily against conviction and requires us to grant a new trial.[11] We overrule Melton's first, second, and third assignments.

## II.  Sixth Amendment Right to Confrontation

Melton argues in his fourth assignment that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment by sustaining the state's objections to questions about what the police had said to the victim. While a criminal defendant's right to confront and cross-examine a witness is found in the Sixth Amendment to the United States Constitution, that right is not unlimited.[12] The trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[13] Thus, " 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' "[14] Further, the "constitutional right to cross-examine adverse witnesses does not authorize defense counsel to disregard sound evidentiary rules."[15]

To the extent that the sustained objections involved hearsay, the trial court did not err in limiting the cross-examination based on that evidentiary ground. To the extent that Melton is arguing that the trial court prohibited questions because it erroneously deemed them irrelevant or only marginally relevant, we disagree. The fact that the victim appeared in court because she felt

10. See *State v. Antill* (1964), 176 Ohio St. 61, 67, 26 O.O.2d 366, 369, 197 N.E.2d 548, 553.

11. See *State v. Thompkins* at 387, 678 N.E.2d at 547, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720–721.

12. See *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683.

13. See *id.*

14. See *id.,* quoting *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15, 19.

15. See *State v. Amburgey* (1987), 33 Ohio St.3d 115, 117, 515 N.E.2d 925, 927.

there would be consequences if she did not do so was a collateral matter and only marginally relevant, if at all. All subpoenaed witnesses are under a compulsion to appear in court. This is not a case where the witness asserted that she had testified untruthfully because of some kind of duress [16]—the objected-to testimony only indicated that she testified because of the possible consequences if she did not appear for the trial. Even if some relevancy is assumed, the jury heard evidence that the victim testified because she felt threatened by legal consequences if she did not do so. We overrule Melton's fourth assignment.

### III. Admissibility of Evidence

Melton argues in his fifth assignment that the trial court erred by allowing the state to repeat a question about the victim's injuries. "A trial court's decision as to the admissibility of relevant evidence should not be disturbed on review unless the trial court has abused that broad discretion and the party affected by the abuse has consequently suffered material prejudice." [17] Assuming for the sake of argument only that the trial court abused its discretion in allowing the question to be reiterated, we hold that the record fails to demonstrate that Melton suffered material prejudice as a result.

This same analysis applies to Melton's claim that the trial court wrongly sustained the state's objection to Melton's question about whether the victim had planned not to testify because Melton had not beaten her, as well as to his other claim that the trial court wrongly overruled his objection to the state asking the victim whether it was possible that Melton had beaten her with a curtain rod. If the trial court's rulings were an abuse of discretion, the record fails to demonstrate that the abuse materially prejudiced Melton.

### IV. Excited Utterance

Melton also challenges the trial court's admission of the victim's 911 call and the testimony of the paramedic who treated the victim at the scene. Melton argues that the call and the statements to the paramedic were not excited utterances under Evid.R. 803(2), because there had been time for the nervous excitement caused by the altercation to lose dominion over the victim's reflective faculties. According to Melton, this was because the beating occurred hours before the statements were made.

We first note that even an extended period of unconsciousness " 'does not necessarily destroy the effect of a startling event upon the mind of the

---

16. See State v. Rieke (Aug. 14, 1997), Cuyahoga App. No. 71237, unreported, 1997 WL 473095.

17. See State v. Zamorski (2000), 141 Ohio App.3d 521, 524, 752 N.E.2d 288, 290.

declarant for the purpose of satisfying the excited-utterance exception to the hearsay rule.' " [18]   Accordingly, " '[t]he question is whether the person upon awakening to consciousness, or in a state of semi-consciousness, lacked sufficient opportunity to gather his or her wits in order to fabricate.' " [19]   Because such a determination is based on questions of fact, this court should not disturb a trial court's determination that a statement was an excited utterance if that determination was reasonable.[20]

The victim testified that she awoke and that Melton started hitting her multiple times.  Sometime during the beating, she either passed out or was rendered unconscious.  When she again awoke, she went to the neighbor's apartment.  The neighbor described the victim as upset and crying.  The victim made the 911 call, stating that her boyfriend had beaten her for several hours.  When the paramedics arrived, the victim told one of them that her boyfriend had beaten her for several hours with a fist, a curtain rod, and a table leg.  A police officer who arrived on the scene when the paramedics were bringing the victim down the stairs described the victim as crying, hysterical, angry, and very scared.  The victim repeated the same story to the officer.

We conclude that the trial court's decision to admit the 911 tape was reasonable.  The description of the victim by her neighbor, coupled with the victim's testimony of "finding" herself at his door, supports a conclusion that she had not sufficiently regained her faculties to fabricate the story.

### V.   Statement for Purposes of Medical Treatment or Diagnosis

If we assume, for the sake of argument only, that the statement to the paramedic was not an excited utterance, it was also admissible as a statement made for purposes of medical diagnosis or treatment under Evid.R. 803(4).  The medical-treatment exception to hearsay applies to statements made to a paramedic, as "[i]t is not necessary that the individual diagnosing or treating the declarant be a physician." [21]

In this case, the paramedic testified that it was important for purposes of treatment that one determine how a victim's injuries were sustained, because the

---

18.   See *State v. Turner* (June 16, 2000), Hamilton App. No. C–990388, unreported, 2000 WL 770136, quoting *State v. Wallace* (1988), 37 Ohio St.3d 87, 90, 524 N.E.2d 466, 469.

19.   See *State v. Turner, supra.*

20.   See *State v. Joyce* (June 12, 1998), Hamilton App. No. C–970642, unreported, 1998 WL 315913.

21.   See *State v. Grooms* (Aug. 19, 1998), Summit App. No. 18558, unreported, 1998 WL 487087.

"mechanism of injury determines direction of treatment." He, therefore, asked the victim what had happened to her, and she told him. While it seems obvious that, generally, the identity of an assailant is not important for diagnosis or treatment, the fact that the victim told the paramedic that Melton was her assailant is not prejudicial in this case, because Melton's identity was established in other testimony. The remaining statements related to the cause of the injuries. We overrule Melton's fifth assignment.

### VI.  Maximum Prison Term

In his sixth assignment, Melton challenges the trial court's imposition of the maximum term of imprisonment. It is only the most egregious offender who should be sentenced to the maximum term of imprisonment.[22]  Consequently, the legislature enacted R.C. 2929.14(C), which, under the facts of this case, permitted the trial court to sentence Melton to the maximum term for felonious assault if it determined that he had committed the worst form of the offense or if he posed the greatest likelihood of recidivism. Before imposing the maximum prison term, the trial court was required, in addition to making one of the above findings, to give reasons supporting its finding.[23]

The trial court found that Melton had committed the worst form of the offense and posed the greatest risk of recidivism. It reasoned that the offense was the worst form based upon the severity of the beating and the fact that "instruments" were used. It supported its finding that Melton posed the greatest likelihood of committing future crimes based on his past record. The trial court pointed out that Melton had been adjudicated delinquent for aggravated robbery, aggravated burglary, grand theft, drug abuse, theft, and assault. Also, as an adult, he had been convicted of discharging a firearm, resisting arrest, and two counts of domestic violence. Under these circumstances, the court was entitled to conclude that Melton posed the greatest likelihood of committing future crimes. Thus, Melton's sixth assignment is overruled.

Therefore, we affirm the judgment of the trial court.

*Judgment affirmed.*

SUNDERMANN and WINKLER, JJ., concur.

_____

**22.**  See *State v. Edmonson* (1999), 86 Ohio St.3d 324, 328, 715 N.E.2d 131, 135.

**23.**  See R.C. 2929.19(B)(2)(e);  *State v. Edmonson, supra,* at 328–329, 715 N.E.2d at 135.