[Cite as *State v. Perdue*, 2012-Ohio-689.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 25766 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JANET L. PERDUE | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2010-03-0674 |

DECISION AND JOURNAL ENTRY

Dated: February 22, 2012

BELFANCE, Presiding Judge.

{¶1} Defendant-Appellant Janet Perdue appeals from her convictions in the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} On March 29, 2009, Ms. Perdue's husband, Dale Perdue raped the couple's two-year old daughter, S.P. As a result, S.P. suffered severe injuries that required corrective surgery. In March 2010, Ms. Perdue was indicted for three counts of endangering children, and based upon conduct that took place after the rape, one count of tampering with evidence, and one count of obstructing justice.

{¶3} The matter proceeded to a jury trial. Following a Crim.R. 29 motion, the trial court dismissed the three counts of endangering children. The jury found Ms. Perdue guilty of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree, and

obstructing official business (as a lesser included offense of obstructing justice), in violation of R.C. 2921.31, a misdemeanor of the second degree.

{¶4}    Ms. Perdue has appealed, raising a single assignment of error for our review.

## II.

## ASSIGNMENT OF ERROR

THE VERDICTS IN THIS CASE WERE BASED ON INSUFFICIENT EVIDENCE AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AS A RESULT, APPELLANT'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED.

{¶5}    Ms. Perdue asserts in her assignment of error that the guilty verdicts for tampering with evidence and obstructing official business were based on insufficient evidence and were against the manifest weight of the evidence.

{¶6}    As Ms. Perdue's argument focuses almost exclusively on the sufficiency of the evidence, we focus our analysis on her argument.  In determining whether the evidence presented was sufficient to sustain a conviction, this Court reviews the evidence in a light most favorable to the prosecution.  *State v. Jenks,* 61 Ohio St.3d 259, 274 (1991).  Furthermore:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶7}    R.C. 2921.12(A)(1), the statute prohibiting tampering with evidence, provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or

thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). The jury was also instructed on complicity with respect to the tampering with evidence charge. R.C. 2923.03(A) provides that:

> No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

{¶8}    The Supreme Court of Ohio has held that:

> [t]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "[P]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." (Internal quotations and citation omitted.) *Id.* at 245.

{¶9}    Ms. Perdue was also convicted of obstructing official business in violation of 2921.31(A) which states that "[n]o person, without privilege to do so and with purpose to

prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." The definition of public official includes law enforcement officers. *See* R.C. 2921.01(A). The jury was also instructed on complicity with respect to this offense. "The making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A)." *State v. Lazzaro*, 76 Ohio St.3d 261 (1996), syllabus.

{¶10} On March 29, 2009 around 1 to 1:30 p.m., Mr. Kent Dammeyer, a friend who rented a room in the Perdue home, heard S.P. in the bathroom crying. He went to see what was wrong and found S.P. on the toilet. When S.P. finished, Mr. Dammeyer wiped her and noticed blood on the toilet paper. He became very concerned and called Ms. Perdue who was just returning from an out-of-town trip. Ms. Perdue asked Mr. Dammeyer to wake Mr. Perdue. Mr. Dammeyer tried, but could not persuade Mr. Perdue to get out of bed. Ms. Perdue was able to make it home by 3 or 3:30 p.m., as she had to stop to get her car from a friend's house where she had left it. Ms. Perdue examined her daughter and found what she described as a hole in the region of her genitals. The bed and the sheets in the master bedroom were stained with large amounts of blood. In addition, there was a small purple sex toy on the mattress that was also bloody. Ms. Perdue testified that she thought that the sex toy could have been used to cause S.P.'s injuries.

{¶11} Mr. and Ms. Perdue began to argue about what to do; Ms. Perdue wanted S.P. to get medical attention, but Mr. Perdue did not because he was concerned that children's services would be involved. Ms. Perdue called her best friend Lorie Peterson to seek advice and asked

her to come over. During the series of conversations Ms. Peterson had with members of the Perdue household, she became aware that S.P. was injured and Mr. Perdue was preventing her from going to the hospital. Thus, Ms. Peterson called the police and reported the incident to them.

{¶12} The police arrived before Ms. Peterson. Ms. Perdue directed the police to the master bedroom. S.P. was taken to the hospital and her injuries required corrective surgery. The police put Mr. and Ms. Perdue up at a local hotel and told them not to return to their residence. Mr. Dammeyer, however, was allowed to return to the home. Mr. and Ms. Perdue discussed having someone go back to the house and put away certain items. According to police, Ms. Perdue indicated that it was her idea to move sex toys located in the basement. That night, Ms. Perdue called Mr. Dammeyer and asked if he would "round up the sex toys[]" because "she didn't think the police were going to look fondly at it * * * ." Mr. Dammeyer refused to do so. Dwayne Kessie, Mr. Perdue's half-brother, testified that Ms. Perdue told him that she and Mr. Perdue "discussed whether or not to go back to the house to try and clean up the house to make – to make it look like she wasn't a bad mother." Mr. Kessie stated that Ms. Perdue told him that she and Mr. Perdue "decided that [Mr. Perdue] would go back to the house and he did that night."

{¶13} Ms. Perdue testified that prior to Mr. Perdue returning to the house, she and Mr. Perdue argued about him going back to the house and that she did not want him to return to the house. Ms. Perdue was aware that both a police investigation and an investigation by children's services was, or was about to be, instituted. According to Ms. Perdue, Mr. Perdue said that the sex toys, lotions, and Playboy magazine would make Ms. Perdue look like a bad mother. Mr. Perdue "kept insisting that he had to go back, he had to go back." Ms. Perdue ultimately

responded, "'It's not a big deal,'" and threw the car keys at Mr. Perdue. Thereafter, Mr. Perdue returned to the residence.

{¶14} That evening the police had been instructed to "spot-check" the hotel and the house for Mr. Perdue's vehicle. The investigating officers learned from patrol that Mr. Perdue had been seen on the road approximately a mile from the residence. In the morning, police proceeded to the hotel to speak with Mr. and Ms. Perdue about signing a consent form to search the house that the Perdues had agreed to earlier. Police asked them if anybody had left the hotel and they both said no. Ms. Perdue admits in her testimony that she lied to police. At that point, two detectives left with Mr. Perdue and one detective waited for Ms. Perdue in the lobby of the hotel. Police conducted a formal interview with Mr. Perdue and then returned him to the hotel. They then picked up Ms. Perdue for her formal interview. On the way to the police car, Ms. Perdue informed police that Mr. Perdue had gone back to the house during the night. Police took Ms. Perdue back to the residence so she could point out what Mr. Perdue was supposed to do while he was there. When they got to the house, Ms. Perdue went to the basement and "point[ed] out the sex toys that were on the couch in the basement that [Mr. Perdue] was to return home to put away." Ms. Perdue told police that Mr. Perdue "'was supposed to put away the sex toys on the couch, the Playboy magazine from the bathroom and lotions and other stuff[]' * * * ." According to police, Ms. Perdue was "upset over the fact that the whole reason for [Mr. Perdue] returning to the house to take care of the [sex toys and magazine] she had concerns about were not touched."

{¶15} While at the residence, police noticed that towers for two computers were missing and the police asked Ms. Perdue about them. Ms. Perdue indicated that Mr. Perdue did not say anything to her about the computers. However, when police asked Ms. Perdue, "'If [Mr. Perdue]

was going to do something with the computers, where would he put them?'" Ms. Perdue replied, "'well we do have a barn out back.'" Police walked with Ms. Perdue outside and "there were the two towers sitting next to the back side of the barn itself." Both computers were missing the hard drives. Police also asked Ms. Perdue about the bedding on the bed, as it could not be located. Later, Ms. Perdue remembered that Mr. Perdue had told her that he did the laundry. Ms. Perdue had Mr. Dammeyer investigate the issue and the bed sheet, a towel, and S.P.'s underwear were found to have been laundered. Subsequent to Ms. Perdue's formal interview, on more than one occasion, Ms. Perdue called the police with information, such as the location of the washed bed sheet, that she believed was relevant to the investigation.

{¶16} Ultimately, Mr. Perdue was convicted of raping S.P. The implement used in the rape was not able to be determined with any reasonable degree of certainty; the use of a sex toy could not be excluded.

{¶17} We conclude that the evidence was sufficient to sustain the guilty verdict for tampering with evidence via complicity. Viewing the evidence in a light most favorable to the State, there was sufficient evidence presented, if believed, to establish that Ms. Perdue, knowing an official investigation was in progress, "supported, assisted, encouraged, cooperated with, advised, or incited[,]" Mr. Perdue to destroy, alter, conceal or remove things with purpose to impair their value in the official investigation. *Johnson*, 93 Ohio St.3d at syllabus, Mr. Dammeyer testified that Ms. Perdue called him and asked him to round up the sex toys in the basement. There was also testimony that, after police informed the Purdues not to return to their home, Mr. and Ms. Purdue discussed whether or not to go back to the house and "clean up the house * * * [,]" and "decided that [Mr. Perdue] would go back to the house * * * ." Ms. Purdue ultimately gave Mr. Purdue the keys to return to the home. Given the testimony presented, it

could be reasonably inferred that Mr. and Ms. Perdue agreed that Mr. Perdue would return to the house and conceal any incriminating items and that Ms. Perdue wanted sex toys concealed so they could not be used against her in any investigation. Viewing the evidence in a light most favorable to the State, we conclude that there was sufficient evidence from which a trier of fact could reasonably conclude that Ms. Purdue shared the intent of Mr. Perdue to impair the value or availability of items in the home as evidence. *See* R.C. 2921.12(A)(1); *see also Johson*, 93 Ohio St.3d at syllabus. The State produced evidence, which if believed, established that Ms. Perdue aided and abetted Mr. Perdue in tampering with evidence and Mr. Perdue did in fact tamper with evidence. Accordingly, we conclude that there sufficient evidence to sustain the guilty verdict for tampering with evidence.

{¶18} Likewise, we determine there is sufficient evidence to sustain the guilty verdict for obstructing official business via complicity. The State contends that Ms. Perdue obstructed official business in one of two ways: (1) by lying to the police about whether anyone left the hotel during the night; or (2) by giving Mr. Perdue the car keys that provided him with the means to return to the house that night. As noted above, "[t]he making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A)." *Lazzaro*, 76 Ohio St.3d at syllabus. Here, Ms. Perdue admits that she lied to the police when initially asked if either she or her husband left the hotel room during the night. Nonetheless, there still must be evidence presented which establishes that "[t]he unprivileged act by the defendant * * * hamper[s] or impede[s] the law enforcement officer in the performance of lawful duties, and the defendant must have a purpose to prevent, obstruct or delay such performance." (Internal quotations and citation omitted.) *State v. McCrone*, 63 Ohio App.3d 831, 834 (9th

Dist.1989); *see also State v. Crowell*, 189 Ohio App.3d 468, 2010-Ohio-4917 (2nd Dist.), ¶ 13 ("Even assuming, arguendo, that Whitley did lie to the officers, there is no evidence in the record that his statements were made with an intent to hamper or impede the investigation, and certainly no evidence that his statements actually had the effect of hampering or impeding the investigation.")

{¶19} Here, one of the detectives involved in the investigation was asked the following at trial: "You learned later from one of your patrol officers * * * that Mr. Perdue was seen on the road about a mile from his house that night?" To which, the detective responded, "That's correct." Thus, even though Ms. Perdue lied to police, it is unclear how, or if, this lie hampered or impeded the investigation. The police already knew that Mr. Perdue had left the hotel that night and was seen in close proximity to the residence, and not long thereafter, Ms. Perdue told the police that Mr. Perdue had left the hotel and returned to the residence. Thus, even assuming that the lie somehow did or could have impeded or hampered the investigation, there was no testimony which even implied that Ms. Perdue's lie hampered or impeded the investigation. Accordingly, we cannot say that the State presented sufficient evidence to establish that Ms. Perdue's act of lying to the police constituted obstruction of official business.

{¶20} Nonetheless, we conclude that there was sufficient evidence to establish that Ms. Perdue was complicit with Mr. Perdue in returning to the home to conceal evidence and that such, particularly when combined with her act of providing Mr. Perdue with the keys to the vehicle, which allowed him the means to return to the residence, constituted complicity to commit obstructing official business. The evidence is clear that police told Mr. and Ms. Perdue not to leave the hotel. In addition, they were aware that a search of their home was going to be conducted. Further, there was evidence that indicated that Ms. Perdue knew Mr. Purdue's

purpose in leaving the residence was to prevent law enforcement from discovering certain items in the home that could be used in the investigations, that she shared his purpose to have certain items concealed, and that Mr. Perdue's actions hindered or impeded the investigation to some degree. Ultimately, Ms. Perdue's actions aided and abetted Mr. Perdue and thereby impeded the police in the search of the residence. Moverover, it is reasonable to infer that it was Ms. Perdue's purpose to do so. Accordingly, we conclude there was sufficient evidence to sustain the guilty verdict for obstructing official business.

{¶21} Ms. Perdue additionally asserts that the verdicts are against the manifest weight of the evidence. In reviewing a challenge to the weight of the evidence, the appellate court:

> "[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Thomas,* 9th Dist. Nos. 22990, 22991, 2006–Ohio–4241, ¶ 7, quoting *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[T]his Court's 'discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thomas* at ¶ 8, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶22} Although, she has not developed this argument, *see* App.R. 16(A)(7), with respect to the tampering offense, Ms. Perdue essentially suggests that, although she was aware of her husband's actions, she fought with him for some time and encouraged him not to return to the home. While the jury was free to believe Ms. Perdue's version of events, we conclude that it was not unreasonable in its evaluation of the evidence and of witness credibility. *See State v. Andrews,* 9th Dist. No. 25114, 2010-Ohio-6126, ¶ 28. After a thorough review of the record, we

conclude that this is not the "'exceptional case in which the evidence weighs heavily against the conviction[,]'" *Thomas* at ¶ 8, quoting *Martin* at 175, and thus, the verdicts were not against the manifest weight of the evidence. Therefore, we overrule Ms. Perdue's sole assignment of error.

<p style="text-align:center">III.</p>

{¶23} In light of the foregoing, we overrule Ms. Perdue's assignment of error and affirm the judgment of the Summit County Court of Common Pleas.

<p style="text-align:right">Judgment affirmed.</p>

<p style="text-align:center">_____</p>

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

<div style="margin-left:50%">

_____

EVE V. BELFANCE
FOR THE COURT

</div>

MOORE, J.
DICKINSON, J.
CONCUR

APPEARANCES:

CHRISTOPHER R. SNYDER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.