OPINION
{¶ 1} Stephen McCoy was convicted pursuant to R.C. 2921.31 of obstructing Dayton police officers in the performance of their duties. Finding that the State's evidence is sufficient to support his conviction, and finding that his conviction is not contrary to the manifest weight of the evidence, we affirm.
 {¶ 2} It was the summer of 2007 and Dayton police officers were looking for *Page 2 
Brian Bunch. An informant told them that Bunch had stolen a recently-recovered car and where they could find him. The officers knew Bunch, and they knew that he had a sometimes violent dislike for them. Out of an abundance of caution, therefore, three officers-Miniard, Schraml, and Downey-advanced toward the house said to contain their suspect. As they neared the house, the front door opened and a man stepped onto the porch. It was McCoy. Officer Miniard took the lead while the two other officers stood to McCoy's right in a tactical "L" position, adopted for safety. (This position is regularly used by police officers when they suspect that a dangerous person may be inside a building.) Miniard identified himself and asked if Brian Bunch was there. "Yes," came the immediate reply. He then told McCoy that they needed to speak with Bunch about an incident. "Do you have a warrant?" McCoy asked. Ignoring the question, Miniard quickly explained that they had found a stolen car just down the street, and that an informant had told them that Bunch was the thief and was here, at McCoy's house, and they really needed to talk to him about this. "Well," said McCoy, "maybe he's here and maybe he's not." (The car was stolen in a different county, and the police there were getting an arrest warrant for Bunch. But it had not yet arrived nor did the officers know whether it had been issued. While they waited for the warrant, knowing that they needed one to enter, their plan was to persuade McCoy to let them into his house, where they would search for and arrest Bunch. They would not, however, enter absent a warrant or McCoy's consent.)
 {¶ 3} Insisting that they needed to talk to Bunch, Miniard told McCoy that delaying them in their duties was ill-advised because he would end up getting himself in trouble. Officer Schraml then spoke up, saying to McCoy, "Let's not play *Page 3 
this game." When McCoy turned and stepped to his right to talk to her, Miniard saw, through the front door's small windows, a shadowy figure approaching. He called this out to the other officers and, unsure but concerned that it was Bunch coming towards the door, he stepped forward to get a better look. Suddenly, he was hit from the left with a body-check delivered by McCoy, who continued to press up against him as he struggled to push McCoy away. Officers Schraml and Downey quickly subdued McCoy. Recovering from the fracas, Officer Miniard, knowing Bunch's violent tendencies and concerned for his and the others' safety, reached out and turned the door-handle. The door swung open and standing in the open doorway was not Bunch but a woman, McCoy's wife.
 {¶ 4} Officer Miniard immediately asked her where Brian Bunch was. She replied that he was in the garage. He asked her to show him. Mrs. McCoy agreed and let Miniard into the garage where he found and arrested Bunch. The officers took McCoy to the hospital and then to jail.
 {¶ 5} McCoy was charged with a misdemeanor under R.C. 2921.31 for obstructing official business. After a short bench-trial on August 23, 2007, he was found guilty. The trial judge imposed a 90-day suspended sentence and placed him on community control. This appeal followed.
 {¶ 6} McCoy assigns two errors to his conviction. First, he contends that the evidence produced by the State was legally insufficient to support a guilty verdict, and second, even if the evidence were sufficient, he contends, the verdict is against its manifest weight. We begin with the question of sufficiency.
 {¶ 7} By contending that there is insufficient evidence, an appellant contends that "no rational factfinder could have voted to convict" him because the *Page 4 
State failed to produce enough evidence to prove each element of the offense. State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541. To review such a contention, therefore, we must examine the State's evidence to determine whether a rational person could conclude that each essential element was proved beyond a reasonable doubt. In our examination, we view the evidence in the light most favorable to the State and draw all permissible inferences in the State's favor. SeeState v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.
 {¶ 8} Obstructing official business is defined as follows:
 {¶ 9} "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A).
 {¶ 10} McCoy argues that the State's proffered evidence is insufficient to prove that he possessed the requisite purpose for acting, insufficient to prove that his act actually hampered or impeded the officers in performing their duties, and insufficient to prove that he was not privileged to act. We conclude that the trial court reasonably found the State's evidence legally sufficient to support each of these contested elements.
 {¶ 11} Before addressing the contested element, there is some confusion in the parties' briefs, which we must first resolve, about which of McCoy's acts formed the basis of the charge. The obstructing act must be an affirmative one. See State v. Wellman,173 Ohio App.3d 494, 2007-Ohio-2953, at ¶ 10. As we have observed, "Ohio courts have consistently held that in order to violate the obstructing official *Page 5 
business statute a defendant must engage in some affirmative or overt act or undertaking that hampers or impedes a public official in the performance of the official's lawful duties." State v. Prestel, Montgomery App. No. 20822, 2005-Ohio-5236, at ¶ 16. "[M]erely failing or refusing to cooperate or obey a police officer's request for information" is not such an act. Id. Sometimes, "statements alone can constitute an `act' within the meaning of the statute." State v.Cooper, 151 Ohio App.3d 790, 2003-Ohio-1032, at ¶ 23. This is particularly the case when the statement is false or incorrect. SeeState v. Lazzaro (1996), 76 Ohio St.3d 261, 264, 667 N.E.2d 384.
 {¶ 12} There are three possible "acts" here: McCoy's failure to cooperate with the officers; his second, arguably prevaricative, statement concerning Bunch's presence; and his shove of Miniard. The State asserts that the physical act of shoving brought the charge not, as McCoy suggests, his other two "acts." The State's closing arguments at trial corroborate its assertion by explicitly linking the shove with the obstruction. Therefore, we base our analysis on this affirmative physical act.
 {¶ 13} Returning to the contested elements, we begin with the mental component necessary to impose criminal liability. The evidence must permit the trial court to have concluded that McCoy acted "with purpose to prevent, obstruct, or delay the performance . . . of any authorized act." The criminal code describes acting "purposely" in two ways. Because obstructing official business is a specific intent offense,State v. Puterbaugh (2001), 142 Ohio App.3d 185, 755 N.E.2d 359, the first description applies here. Therefore, McCoy acted purposely if he acted with the "specific intention to cause a certain result." R.C. 2901.22(A). *Page 6 
 {¶ 14} The evidence must be sufficient to find that McCoy intended to obstruct the officers. Because no one can know the mind of another, a defendant's intent is "not discernible through objective proof."State v. Huffman (1936), 131 Ohio St. 27, at syllabus ¶ 4. Rather, a defendant's intent in acting must be "determined from the manner in which it [the act] is done, the means used, and all other facts and circumstances in evidence." State v. Wellman (2007),173 Ohio App.3d 494, 2007-Ohio-2953, at ¶ 15.
 {¶ 15} McCoy admits that he pushed Officer Miniard, but argues that he did so to stop him from unlawfully-warrantlessly-entering his, McCoy's, home. The State argues that he pushed the officer in an attempt to prevent him from seeing Bunch inside the house. The officers testified that they did not intend to enter the house. Moreover, there is no testimony that they told McCoy or even indicated to him that they wanted to enter. The officers asked only that he bring Bunch to them. Nor does the evidence reveal that McCoy ever referred to, or even alluded to, his constitutional rights. Further, just before McCoy shoved him, Miniard called out that someone was approaching. He did not call out, for example, that he was "going in" to find Bunch. We find no evidence in the record that supports McCoy's stated reason for acting. Indeed, McCoy, who is the only person who really knew his intent, did not testify. By not offering any testimony, McCoy is left to argue about what inferences should be drawn from the State's evidence. For purposes of our review, however, we are required to draw all reasonable inferences in favor of the State. Therefore, based on the evidence in the record, we think that the trial court could have rationally concluded that McCoy's purpose in pushing Officer Miniard *Page 7 
was to obstruct his efforts to determine whether the shadowy figure was their suspect.
 {¶ 16} Not only must the State prove that McCoy intended to obstruct the officers, but it also must prove that McCoy succeeded in actually hampering or impeding them. See State v. Kates, 169 Ohio App.3d 766,2006-Ohio-6779, at ¶ 21 and State v. Cooper, 151 Ohio App.3d 790,2003-Ohio-1032. Webster's defines the verb "hamper" as "to impede motion or progress; to embarrass; to encumber." Webster's Revised Unabridged Dictionary (1998), available athttp://dictionary.reference.com/browse/hamper. And it defines "impede" as "to hinder; to stop in progress; to obstruct." Webster's Revised Unabridged Dictionary (1998), available athttp://dictionary.reference.com/browse/impede. We point out that this element does not require that McCoy cause the officers to fail in their duties, but only that, by acting, he disrupted their performance of them. We find the evidence more than sufficient for the trial court to have concluded that his physical attack did so.
 {¶ 17} Finally, McCoy, regardless of his reason for acting, was not privileged to push Officer Miniard. A privilege here is "an immunity, license, or right conferred by law, bestowed by express or implied grant arising out of status, position, officer, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). It is "a positive grant of authority entitling one to deliberately obstruct or interfere with a police officer performing his lawful duties." State v. Stayton (1998),126 Ohio App.3d 158, 163, 709 N.E.2d 1224.
 {¶ 18} McCoy argues that he had a right to resist the officers' attempted entry because the entry would have been warrantless, that is, unlawful. He is correct that *Page 8 
Fourth Amendment jurisprudence gives a homeowner (absent exigent circumstances, which do not exist here) the right to resist an unlawful entry by police officers. See Middleburg Hts. v. Theiss (1985),28 Ohio App.3d 1, 501 N.E.2d 1226. Consequently, a homeowner whose "act" might otherwise be criminal under the obstructing-official-business statute escapes prosecution because she has a right deliberately to obstruct an unlawful entry. The problem with McCoy's argument, though, (aside from the evidence suggesting that it was not his constitutional rights that he was actually trying to protect) is the way in which he exercised his right to resist.
 {¶ 19} The right is limited. A homeowner may not take whatever action she deems necessary to prevent a police officer's unlawful entry. Certainly, as we saw above, she need not cooperate with police in this situation. Furthermore, at least with respect to the right to resist, a homeowner may say most anything to officers in an attempt to persuade them not to enter. See id. But the same cannot be said about physical resistance. While some passive physical resistance is permitted, for example, a homeowner may close or lock the door or perhaps even physically obstruct the entrance to her home with her body, id. at 4, she may not shoot the officer. Stated generally, the Fourth Amendment does not grant a homeowner the right to use deadly force to resist an unlawful entry.
 {¶ 20} Between passive resistance and the barrel of a gun, though, the law does not clearly identify how much active force a homeowner may use in this situation. We agree with the Middleburg court, however, that "passive resistance is more likely to be privileged than a physical attack on the officer." Id. at 4 n. 4. Although we decline to draw a bright line on the force spectrum, we think that *Page 9 
McCoy's body-check against Officer Miniard, in this case, strays too far down the spectrum away from passive resistence and should not be condoned by the law. McCoy, by shoving Officer Miniard, went beyond his right to resist an unlawful entry, and therefore, he acted without privilege to obstruct.
 {¶ 21} Concluding that the State's evidence is legally sufficient to support a guilty verdict, we overrule the first assignment of error.
 {¶ 22} McCoy's second assignment of error alternatively contends that the verdict is against the manifest weight of the evidence. The court inState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717, expressed the test that we use here this way: "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." We must defer to the trial court's credibility judgments on the witnesses. See State v. Lawson (April 28, 2000), Montgomery App. No. 17470, 2000 WL 492078, at *1. Yet, the manifest weight standard does permit us, in a limited fashion, to assess the believability of the evidence. Fairborn v. Boles (May 15, 1998), Greene App. No. 97-CA-110, 1998 WL 241823, at *3.
 {¶ 23} Our task here is somewhat easier than usual because there are no conflicts in the evidence. McCoy did not put on any witnesses. There is no opposing testimony; the only evidence offered at trial was the testimony of the State's witnesses. Without contrary evidence, then, we have no reason to doubt the credibility of any of the witnesses, nor do we find their testimony unbelievable. McCoy has failed to convince us that the trial court lost its way *Page 10 
and created a manifest injustice. Therefore, we must also overrule McCoy's second assignment of error.
 {¶ 24} The judgment of the trial court is affirmed.
WOLFF, P.J., and DONOVAN, J., concur.
Copies mailed to:
 Hon. Dennis J. Greaney *Page 1