[Cite as *State v. Cole*, 2011-Ohio-409.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  13-10-30

      v.

DANIEL LEVI COLE,

                                      **O P I N I O N**

      DEFENDANT-APPELLANT.

Appeals from Seneca County Common Pleas Court

Trial Court No. 09-CR-0213

Judgment Affirmed

Date of Decision:  January 31, 2011

APPEARANCES:

      *Martin D. Koop*  for Appellant

      *Derek W. DeVine and Gregory A. Tapocsi*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Daniel Levi Cole (hereinafter "Cole"), appeals the judgment of conviction and sentence entered against him by the Seneca County Court of Common Pleas, which found him guilty of failure to comply with the order or signal of a police officer. For the reasons that follow, we affirm.

{¶2} On September 23, 2009, the Seneca County Grand Jury indicted Cole with one count of failure to comply with the order or signal of a police officer in violation of R.C. 2921.331(B), (C)(5)(a)(i), a felony of the third degree. Cole entered a plea of not guilty to the count and waived his right to a trial by jury.

{¶3} On March 18-19, 2010, the case proceeded to a bench trial. At trial, the State presented testimony from the officer who had been directly involved in the incident. Officer Lourel Benavides, a patrolman for the village of Bettsville, testified that she had been working on August 7, 2009, within the village limits, and had been patrolling the area and observing traffic. (Id. at 12-13). Officer Benavides explained that she had been wearing her uniform and had been driving a marked Bettsville police cruiser, which was grey in color and had large reflective logos on both of the sides of the car that stated "Bettsville," and which was equipped with an audible siren system and overhead lights. (Id. at 14-18); (State's Ex. 1, 2, 3). Around 11:56 a.m., Officer Benavides said that she observed a tan Mercury Sable traveling at what she believed to be faster than the posted speed

limit, which in that particular area was 25 m.p.h. (Mar. 18, 2010 Tr. at 12-13, Vol. I). As the vehicle drove past her location, she observed that the driver's side window was rolled half-way down, and thus, she could clearly identify that the driver and sole occupant of the vehicle was the defendant. (Id. at 13).

{¶4} Officer Benavides testified that the vehicle had been originally traveling eastbound on State Route 12, and then, it abruptly turned southbound onto King Street without signaling. (Id. at 19). Once she saw the vehicle turn onto King Street without signaling, Officer Benavides said that she immediately began to follow the vehicle. (Id.). By the time she approached the intersection of State Route 12 and King Street, the vehicle was approximately two blocks ahead of her on King Street. (Id. at 20). Officer Benavides said that she then observed the vehicle approach the intersection of King Street and David Street, roll through the stop sign, and again abruptly turn left (eastbound) onto David Street without signaling. (Id.). Officer Benavides continued to follow the vehicle, and by the time she came to the stop sign at the intersection of King and David, she said that the vehicle was still traveling eastbound on David. (Id.). While she was momentarily stationary at that intersection, Officer Benavides said that she utilized her handheld radar unit, which indicated that the tan Mercury Sable was traveling at 35 m.p.h. in a 20 m.p.h. school zone. (Id. at 22).

{¶5} Officer Benavides stated that when she turned onto David Street, she alerted her audible sirens twice and activated her flashers. (Id. at 22). At trial, Officer Benavides confirmed that her flashers and the audible sirens had been working properly that day. (Id. at 22-23). Officer Benavides testified that after she turned on her flashers and began to follow the vehicle on David Street, the tan Mercury Sable began to accelerate and continue to the intersection of David and Michael Street, at which point in time Officer Benavides "noticed that he [] looked up like in an upward motion as if looking in the rearview mirror and continued on." (Id. at 23). When the vehicle reached the next intersection, it rolled through that stop sign and continued on David Street towards the intersection at Sullivan Street. (Id. at 23). Officer Benavides said that the vehicle then turned right "abruptly" without signaling onto Sullivan Street and began to accelerate up Sullivan Street heading southbound. (Id. at 24). Officer Benavides said that at that point she radioed dispatch and told them that she was in pursuit of a vehicle that was not pulling over upon her signals and requested back-up. (Id. at 24).

{¶6} While following the vehicle on Sullivan Street, which was located in a residential area with a posted speed limit of 25 m.p.h., Officer Benavides again testified that the tan Mercury Sable began to accelerate and, that at one point, she said that her speedometer read 65 m.p.h. (Id. at 24-25). She further stated that she had been "nervous and scared" going that fast down the residential street since

there was a playground nearby, along with residential homes right next to the road. (Id. at 25-26). Officer Benavides also noted that there had been several places that the vehicle could have utilized and pulled over onto on Sullivan Street, including a school parking lot, several driveways and pull-off areas in front of adjacent homes. (Id. at 26-27).

{¶7} Officer Benavides testified that rather than pulling over the vehicle continued to travel on Sullivan until it "abruptly" turned left onto Douglas Street, but this time she said that she lost sight of the vehicle. (Id. at 27). Nevertheless, when she eventually turned onto Douglas Street, Officer Benavides testified that she noticed "a cloud, dust of smoke, white smoke from rocks to the left down [an] alleyway," so she decided to turn left down the alleyway. (Id.). Upon turning into the alley, Officer Benavides said that she immediately noticed skid marks leading to the tan Mercury Sable which was now crashed into the back of a residential garage door. (Id. at 27); (State's Exs. 4-7). As Officer Benavides pulled up, she said that Cole was already out of the vehicle and was going towards the front of his vehicle to look at the damage to the car and garage. (Id. at 33). When she got out of her vehicle, she noticed that Cole was talking on his cell phone, and when he saw her she said that he began to shout obscenities at her. (Id.). Officer Benavides described Cole's demeanor as being aggressive and angry. (Id.). Officer Benavides testified that she told Cole to put down his cell phone and get

back in his vehicle, but when he failed to comply with her orders she said that she drew her weapon. (Id. at 35). Eventually, she said that Cole got back in to his vehicle and soon afterwards Officer Mackling arrived at the scene and assisted her in arresting Cole for fleeing and eluding and driving under suspension. (Id. at 36). While placing Cole under arrest, Officer Benavides said that Officer Mackling asked Cole why he had not stopped, and Cole responded by apologizing to her and said that he had seen the flashers but had decided to flee. (Id. at 36).

{¶8} Overall, Officer Benavides testified that the incident had lasted approximately two minutes from the time when she had turned on her flashers and activated her audible sirens to when she saw Cole and his vehicle at the back of the residential garage. (Id. at 34). With respect to her interactions with Cole after he had crashed into the residential garage door, Officer Benavides described Cole's demeanor as being aggressive and angry towards her. (Id. at 33). Additionally, as a result of Cole's actions, the bottom part of the residential garage door was "pushed in" about a foot and was rendered inoperable. (Id. at 29).

{¶9} At the close of the State's case, the defense made a motion for acquittal pursuant to Crim.R. 29 claiming that the State had failed to present sufficient evidence on the requisite mental state. The trial court denied the motion.

{¶10} Cole then took the stand and testified as to his version of events. Cole testified that he had been driving a tan Mercury Sable on August 7, 2009 through the village of Bettsville. (Mar. 19, 2010 Tr. at 203, Vol. II). In particular, Cole said that he had been coming up State Street and was getting ready to turn left onto Route 12 when he noticed a Bettsville police cruiser drive past him on Route 12 and turn right on the same street he had been planning on turning onto. (Id.). Cole's testimony further provided:

> **Q. Okay. What happened after you saw the police cruiser?**
> **A. I didn't think she would notice me or nothing, you know. So I took a right to get out of town because I know I don't got a driver's license. So I wanted to get out of town. I was out filling out applications. I wanted to get out of town as quick as possible. That's why I tried, because Bettsville was closed down that day for like maybe a week. You couldn't go through State Street. So I just wanted to get out of town quick before she got on the other side of town and seen me again. So that's, you know –**
> **Q. So did she have her lights on when you passed her?**
> **A. No.**
> **Q. Did she signal with some sort of audio device to say pull over?**
> **A. No.**
> **Q. Did she give you any hand gestures?**
> **A. No.**
> **Q. Say, hey, pull over?**
> **A. No.**
> **Q. So it was your angle to get out of town?**
> **A. Right.**
> **Q. Did that mean you were running from her?**
> **A. No, sir.**
> **Q. But you were leaving town in a hurry, weren't you?**
> **A. Yes, sir.**

> Q. You weren't being chased?
> A. No, I would never flee. I was not being chased.
> Q. What was – did you ever see the overhead lights?
> A. Yes.
> Q. When did you see the overhead lights?
> A. When I turned on to Sylvania, I was about two blocks ahead and I looked back and I seen her cop car coming, just coming on to Sylvania. That's the second time I seen her. And she had her lights on.
> Q. So what'd you do?
> A. I turned off the road, you know. If a cop gets behind you, you're supposed to pull out of the way or get out of her way, I guess.
> Q. Did you try to get out of her way?
> A. Yes.
> Q. How did you end up into the garage?
> A. I was watching where she was going then I seen her take a left and the left in the alley. I was paying attention to her. Seen she was after me. So I pulled straight over in the driveway. I was going a bit too fast. I slid in the stones and I hit the garage door.

(Id. at 203-05). Cole then said that when he got out of his car to look at the damage to the car and the garage door, the officer pulled up behind him and he told her that he was only getting out of his vehicle to check the damage. (Id. at 206). Cole testified that he did not believe he had been aggressive towards the officer and believed he had been "respectful." (Id. at 206). Moreover, while he acknowledged that he had told Officer Mackling that he had seen the police cruiser's activated lights, he denied telling the officers that he had been fleeing. (Id.). Cole also said that although Officer Benavides screamed and yelled at him when she pulled up to his vehicle, he said that she never drew her weapon on him.

(Id. at 205). Nevertheless, Cole admitted to speeding, driving while under an operator's license suspension, and committing two stop sign violations. (Id. at 208). However, he again stated that he had not been fleeing from the police officer because he had not known that the lights were intended for him. (Id.). In fact, Cole said that once it became apparent to him that the police officer was pursuing him, he pulled into the alley and immediately pulled into a driveway, but because he had been going too fast, he lost control of his car and ran into a garage door on the property. (Id.).

{¶11} On March 24, 2010, after having considered all of the evidence, the trial court found Cole guilty of failure to comply with an order or signal of a police officer. The trial court postponed the matter for sentencing and ordered a pre-sentenced investigation ("PSI") be conducted.

{¶12} On July 20, 2010, the trial court sentenced Cole to five (5) years imprisonment and additionally imposed a ten (10) year Class II driver's license suspension.

{¶13} Cole now appeals and raises the following three assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION UNDER CRIM.R. 29(A) FOR ACQUITTAL.**

## ASSIGNMENT OF ERROR NO. II

**THE CONVICTION OF APPELLANT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.**

## ASSIGNMENT OF ERROR NO. III

**THE VERDICT OF GUILTY RENDERED BY THE JUDGE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶14} In his first two assignments of error, Cole argues that the State failed to present sufficient evidence that he had acted "willfully" in failing to comply with the signal of the police officer. As a result, Cole claims that the trial court erred in denying his Crim.R. 29(A) motion for acquittal and that his conviction was not supported by sufficient evidence. Additionally, in his third assignment of error, Cole argues that his conviction was also against the manifest weight of the evidence.

{¶15} Crim R. 29(A) provides,

**The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction for such offense or offenses.**

"Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved

- 10 -

beyond a reasonable doubt." *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus. This court has previously found that the *Bridgeman* standard "must be viewed in light of the sufficiency of evidence test * * *." *State v. Foster* (Sept. 17, 1997), 3d Dist. No. 13-97-09, at *2.

{¶16} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.

{¶17} We note that while Cole raised a Crim.R. 29(A) motion at the close of the State's case, Cole failed to renew his Crim.R. 29(A) motion at the close of all of the evidence presented at trial. However, Cole was tried to the bench, and "'[i]n [a] non-jury trial * * * the defendant's plea of not guilty serves as a motion for judgment of acquittal, and obviates the necessity of renewing a Crim.R. 29 motion at the close of all the evidence.'" *State v. Ham*, 3d Dist. No. 16-09-01,

2009-Ohio-3822, ¶10, quoting *City of Dayton v. Rogers* (1979), 60 Ohio St.2d 162, 163, 398 N.E.2d 781, overruled on other grounds by *State v. Lazzaro* (1996), 76 Ohio St.3d 261, 667 N.E.2d 384. See, also, *State v. Stoner*, 2nd Dist. No. 2008 CA 83, 2009-Ohio-2073, ¶22, and *State v. Bidlack* (Oct. 16, 1987), 3d Dist. No. 11-85-8, at *1, both citing *Rogers*, 60 Ohio St.2d 162.

**{¶18}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. Id. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶30, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

**{¶19}** Here, Cole was charged with failure to comply with an order or signal of a police officer, which is prescribed in R.C. 2921.331(B). R.C.

2921.331(B) provides "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." Further, R.C. 2921.331(C)(5)(a)(ii) provides that "[a] violation of division (b) of this section is a felony of the third degree if the jury or judge as trier of fact finds any of the following by proof beyond a reasonable doubt: * * * The operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property."

{¶20} On appeal Cole only argues that the State failed to prove the requisite mental culpability: that he "willfully" eluded or fled from the police officer. As a result, Cole argues that the trial court erred in denying his Crim.R. 29(A) motion, and also argues that his conviction was not supported by sufficient evidence and that his conviction was against the manifest weight of the evidence.

{¶21} With respect to the sufficiency argument, while Cole claims that there was insufficient evidence to show that he "willfully" fled or eluded Officer Benavides, we find that after construing the evidence in a light most favorable to the State, there was sufficient evidence for the trier of fact to find that Cole willfully fled or eluded Officer Benavides based on his actions that day.

{¶22} The term "willfully" is not defined in R.C. 2901.22, which is the statutory provision that covers culpable mental states for criminal liability.

However, the 1974 committee comments to R.C. 2901.22 state the following: "Purpose is defined in terms of a specific intention either to cause a certain result, or to engage in conduct of a certain nature regardless of what the offender intends to accomplish through that conduct. 'Purposely' in the new code equates with 'purposely,' 'intentionally,' 'willfully,' or 'deliberately' in the former law."

{¶23} Generally, the intent of a person cannot be proven by direct evidence, thus proof of intent may be shown from circumstantial evidence. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293; *State v. O'Black*, 3d Dist. No. 1-10-25, 2010-Ohio-4812, ¶18. Circumstantial evidence is "'the proof of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind.'" *State v. Fisher*, 3d Dist. No. 2-10-09, 2010-Ohio-5192, ¶26, quoting *State v. Duganitz* (1991), 76 Ohio App.3d 363, 367, 601 N.E.2d 642, citing Black's Law Dictionary (5 Ed.1979) 221. Notably, circumstantial evidence and direct evidence have the same probative value, and in fact, "'[c]ircumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence.'" Id. at ¶27, quoting *Lott*, 51 Ohio St.3d at 167, quoting *Michalic v. Cleveland Tankers, Inc.* (1960), 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20.

**{¶24}** Here, Officer Benavides testified that on August 7, 2009, while wearing her uniform and driving a marked police cruiser, she observed a tan Mercury Sable going faster than the posted speed limit and "abruptly" turn without signaling. Officer Benavides said that she followed the vehicle and additionally observed it roll through a stop sign, turn again without signaling, and speed through a school zone. Consequently, Officer Benavides said that she activated her lights and sirens; however, instead of stopping, the vehicle began to accelerate. Moreover, Officer Benavides said that the vehicle rolled through another stop sign, turned again without signaling, and accelerated to speeds close to 65 m.p.h. in a residential area where the posted speed limit was 25 m.p.h. Finally, while she momentarily lost sight of the vehicle in her pursuit, she said that she eventually found the vehicle in an alley, crashed into a residential garage door. Officer Benavides testified that Cole had been the driver and sole occupant of the tan Mercury Sable and that his demeanor towards her had been angry and aggressive. Furthermore, Officer Benavides stated that Cole acknowledged that he had seen her lights, but had told her that he had decided to flee.

**{¶25}** After viewing this evidence in a light most favorable to the State, we believe that any rational trier of fact could have found the element of the requisite mental culpability proven beyond a reasonable doubt, specifically that Cole "willfully" fled or eluded a police officer. After Officer Benavides activated her

lights and sirens, the evidence indicates that Cole did not stop but in fact began to accelerate down a residential street. Not only did Cole accelerate after Officer Benavides had activated her lights and sirens, but the evidence demonstrates that he made two "abrupt" turns onto other streets, and again continued to accelerate, at one point reaching speeds of up to 65 m.p.h. Furthermore, despite the fact that there had been several places in which Cole could have used to pull-over, the evidence again shows that he continued to travel down the residential streets with Officer Benavides following behind him, and only came to a stop after he crashed into a garage door. Overall, this whole incident, from the time when Officer Benavides activated her lights and sirens to when she discovered Cole crashed into a garage door, lasted approximately two minutes. Therefore, given Cole's immediate acceleration upon the activation of the officer's lights and sirens, the length of time in which he continued to drive with the officer behind him, and the unpredictable and sometimes dangerous manner in which he drove his vehicle, we believe that there was sufficient evidence for the trial court to have found that Cole "willfully" fled or eluded Officer Benavides.

{¶26} In further support of our position, we find the Tenth District Court of Appeals' decision in *State v. Garrand*, 170 Ohio App.3d 487, 2007-Ohio-1244, 867 N.E.2d 887, instructive. In *Garrand*, the Tenth District Court of Appeals held that it could be inferred from the facts of the case that the defendant had acted

willfully concerning a failure to comply charge. 2007-Ohio-1244, at ¶32. Similarly to the facts in this case, the police in *Garrand* had activated their lights and siren and began to follow the defendant in his vehicle; however, the defendant did not stop, but continued to speed through several intersections before finally pulling over. Id. On appeal, the Tenth District found that because the defendant "did not stop, but continued to speed and prolong the police pursuit until he abruptly stopped on [another street]. [It could] infer appellant willfully eluded the police from such conduct given that '[i]t is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.'" Id., quoting *Lott*, 51 Ohio St.3d at 168. See, also, *State v. Roberts*, 8th Dist. No. 91086, 2008-Ohio-5750, ¶¶9-10 (citing *Garrand* and finding that the testimony at trial, along with the defendant's erratic driving, were sufficient to meet the element of willfully eluding a police officer's signal); *State v. Love*, 9th Dist. No. 21654, 2004-Ohio-1422, ¶19 (holding that the following evidence was sufficient to support a failure to comply conviction: defendant ran a red light, drove through residential areas at 10 to 15 m.p.h. over the speed limit, ran two stop signs, drove in the middle of the road, and forced other drivers to pull over all while two police cars with lights and sirens activated were in pursuit of him); *State v. Hill*, 1st Dist. No. C-030678, 2004-Ohio-2275, ¶¶8-13 (stating that "when the police car came within view of the defendant's motorcycle," the

defendant swerved from lane to lane and sped up from 74 to 120 m.p.h., and holding that this conduct "was a willful design to flee a police officer"). Here, the evidence indicates that after the officer activated her lights and sirens, Cole did not stop but in fact began to accelerate and speed through residential areas, prolonging the police pursuit until he crashed into the back of a residential garage. Thus, we may infer from such conduct that Cole was willfully fleeing the police, and consequently, we find that the trial court did not err in denying Cole's Crim.R. 29(A) motion and we additionally find that his conviction was supported by sufficient evidence.

**{¶27}** With respect to Cole's argument that his conviction was against the manifest weight of the evidence, Cole claims that his testimony showed that he did not willfully flee or elude a police officer because he had not known that the signal was directed for him and he had only been trying to get out of the way for the officer.

**{¶28}** First of all, we note that Cole admitted to committing several traffic offenses that day, including speeding, driving while under an operator's license suspension, and committing two stop sign violations, which tend to support Officer Benavides' version of events. In addition, Cole disclosed at trial that he had "wanted to get out of town as quick as possible * * * before she got on the other side of town and seen me again" since he had been driving without an

operator's license. Moreover, despite Cole's testimony that he had not known that the police officer had been pursuing him, there was evidence that he had acknowledged to the officers that he had observed the officer's activated lights.

{¶29} Furthermore, while Cole testified that he had not known that the officer had been pursuing him and that he had only been trying to get out of her way, his testimony conflicts with Officer Benavides' testimony regarding his actions that day. The Ohio Supreme Court has clearly stated that appellate courts must defer conflicts in the evidence to the trier of fact who had the opportunity to hear the witnesses and observe their demeanor. *State v. Awan* (1986), 22 Ohio St.3d 120, 123, 489 N.E.2d 277. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." Id.

{¶30} The credibility of Officer Benavides' and Cole's testimony was an issue of fact for the trier of fact. Here, the trial court chose to believe Officer Benavides' testimony rather than Cole's testimony. Since the weight to be given the evidence and the credibility of witnesses are primarily reserved for the trier of fact, without more, we will not second guess the conclusion of the trial court. Therefore, we cannot find that Cole's conviction was against the manifest weight of the evidence.

**{¶31}** Cole's first, second, and third assignments of error are, therefore, overruled.

**{¶32}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J., and WILLAMOWSKI, J., concur.**

**/jlr**