[Cite as *State v. Wilson*, 2022-Ohio-1146.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-10-023 |
| | : | O P I N I O N |
| - vs - | | 4/4/2022 |
| | : | |
| BILLIE J. WILSON, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. CRI 20210132

Jess C. Weade, Fayette County Prosecuting Attorney.

Steven H. Eckstein, for appellant.

**S. POWELL, J.**

{¶ 1} Appellant, Billie J. Wilson, appeals from her conviction in the Fayette County Court of Common Pleas after a jury found her guilty of single counts of failure to comply with an order or signal of a police officer and obstructing justice. For the reasons outlined below, we affirm Wilson's conviction.

**Facts and Procedural History**

{¶ 2} On June 1, 2021, Sergeant Mike Ross with the Ohio State Highway Patrol filed a complaint in the Fayette County Municipal Court charging Wilson with the two above-named offenses. According to the affidavit of facts submitted by Sergeant Ross, the charges against Wilson arose on May 29, 2021 after Wilson "hindered the apprehension" of her son, Kaleb Hensley, who was at that time "being actively chased on foot by state troopers stemming from a motor vehicle pursuit." According to Sergeant Ross' affidavit of facts, Wilson then "allowed the suspect," Hensley, to "get into her motor vehicle at the intersection of Jane and Smith Street [in the village of Jeffersonville, Fayette County, Ohio] knowing he was being actively chased by troopers."

{¶ 3} Sergeant Ross' affidavit of facts further states that once Hensley was inside Wilson's vehicle that "Ms. Wilson fled and nearly struck another state trooper," Trooper Brian Parsons, "head on in his patrol car while attempting to escape." Sergeant Ross' affidavit of facts additionally states that, "[a] short vehicle pursuit ensued again into the Village of Jeffersonville." Sergeant Ross' affidavit of facts alleges Wilson then "stopped her vehicle and her son," Hensley, "got out and ran on foot again into a residence." Sergeant Ross' affidavit of facts concludes by alleging Wilson then "continued on around the block and later returned to the scene where she was taken into custody."

{¶ 4} On June 8, 2021, Wilson appeared before the municipal court and waived a preliminary hearing. Upon Wilson waiving a preliminary hearing, the municipal court set Wilson's bond at $20,000 and bound the matter over to the Fayette County Court of Common Pleas for further proceedings. Approximately six weeks later, on July 23, 2021, the Fayette County Grand Jury returned an indictment charging Wilson with one count of failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), a third-degree felony under R.C. 2921.331(C)(5)(a)(ii). The indictment also charged Wilson

with one count of obstructing justice in violation of 2921.32(A)(2), a fifth-degree felony under R.C. 2921.32(C)(3).

{¶ 5} On July 27, 2021, Wilson appeared at her arraignment hearing and entered a not guilty plea to both failure to comply with an order or signal of a police officer and obstructing justice charges. After the conclusion of several other unrelated proceedings, the matter ultimately proceeded to a one-day jury trial held on October 5, 2021. During trial, the jury heard testimony from just two witnesses, Trooper Parsons and Wilson. The jury also viewed video footage of the incident taken from Trooper Parsons' cruiser camera. The following is a summary of Trooper Parsons' and Wilson's trial testimony and evidence presented at that one-day jury trial.

*Trooper Parsons' Trial Testimony*

{¶ 6} Trooper Parsons, a four-year veteran with the Ohio State Highway Patrol, testified that he was on duty working "in tandem" with Sergeant Ross on the afternoon and early evening hours of May 29, 2021. Trooper Parsons testified that while on duty that day he conducted several traffic stops. Trooper Parsons testified that one of those traffic stops occurred on southbound I-71 near mile marker 63. Trooper Parsons testified that he "discontinued" that traffic stop, however, after receiving word that Sergeant Ross had attempted to pull over a red/maroon Dodge Caravan minivan, but that the driver, later identified as Wilson's son, Hensley, "was not stopping."[1] Trooper Parsons testified that he did this in order to "get in position" to provide Sergeant Ross with backup because he knew he was "the closest unit to Sergeant Ross."

{¶ 7} Trooper Parsons testified that after discontinuing his traffic stop, he

---

1. The record indicates that, because of this incident, Hensley pled guilty to one count failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), a third-degree felony under R.C. 2921.331(C)(5)(a)(ii), for which he was sentenced to a 24-month prison term.

proceeded southbound on I-71 heading towards US 35. Trooper Parsons testified that after driving southbound on I-71 for a short while that he "could see them out in the distance," as well as the lights from Sergeant Ross' cruiser. Trooper Parsons testified that he then continued "just trying to play catch up and get behind the pursuit" as Sergeant Ross followed Hensley onto northbound SR 729 towards Jeffersonville, Fayette County, Ohio. Trooper Parsons testified that during this pursuit he had his lights on, his siren blaring, and that he was traveling at a high rate of speed. Trooper Parsons' testimony is confirmed by video footage taken from his cruiser camera.

{¶ 8} Explaining what happened next, and with the video footage taken from Trooper Parsons' cruiser camera playing in the background, Trooper Parsons testified:

> So, as I come into Jeffersonville, I didn't know where Sergeant Ross had went. He advised me that they were on an unnamed alley. That the male suspect driving the vehicle had fled on foot. As I rounded that corner there, I saw the suspect running down the road and start to (unintelligible) things around the building behind him. I was trying to close distance with my car and I saw the suspect jump into this a (sic) grey [F]ord here, at the time we didn't know if it was a carjacking.

{¶ 9} Trooper Parsons testified that he then "positioned [his] patrol car to keep the gray vehicle from leaving" and that he "just tried to get the vehicle in a position where [he] can stop the person" he was pursing, i.e., Hensley, from escaping. There is no dispute that the gray vehicle Trooper Parsons saw Hensley get into was being driven by his mother, Wilson. There is also no dispute that Wilson did not stop her vehicle when approached by Trooper Parsons in his cruiser. Trooper Parsons testified that Wilson instead sped off and "nearly struck [his] patrol car as she pull[ed] away." Trooper Parsons testified that Wilson then proceeded to drive away from him at an "excessively fast" rate of speed. Trooper Parsons testified that Wilson then ran a stop sign. Trooper Parsons' testimony is again confirmed by the video footage taken from his cruiser camera.

{¶ 10} Trooper Parsons testified that given Wilson's behavior in speeding away from him rather than just stopping her vehicle that he believed Wilson "was running from [him]." Trooper Parsons also testified when asked if Wilson slowed back down after speeding away from him:

> No, she, she pulls away nearly strikes my patrol car, she pulls away, like I said, to me at the time I've been in several pursuits in my career, it felt like I was getting into a vehicle pursuit at that moment. She pulls away, she makes a left hand turn there onto 729. Um, if I recall correctly there was even somebody standing in his yard right there at that intersection with 729 when she makes a left, ah and he was holding up his hands stopping traffic because he knew I was coming through. This wasn't a situation where anybody in the public would have looked at that and said I wasn't in pursuit with that vehicle.

Trooper Parsons' testimony is once again confirmed by the video footage taken from his cruiser camera.

{¶ 11} Describing what happened next, Trooper Parsons testified:

> I get back into pursuit through Jeffersonville here. Camera doesn't pick it up, they [i.e., Wilson along with her son, Hensley,] make this right hand turn here onto 729 heading north. As I make this right hand turn I can see through my passenger window that [Hensley] just bailed on foot. The car continues. I stop here and I can see [Hensley] running through this parking lot [and] the rest of what happens here will be off camera.

{¶ 12} Trooper Parsons later testified that he did not believe Wilson actually stopped to let Hensley out of her vehicle, but that "she just slowed down to a slow roll and he jumped out while the vehicle was moving." Trooper Parsons also testified when re-watching the video footage taken from his cruiser camera, in pertinent part, the following:

> This is the final right hand turn unto north 729. As I made that right hand turn, I looked through my passenger side window in the front. I saw the vehicle slow down and [Hensley] exit. As I complete the right hand turn the dash cam picks the vehicle back up. I stop, exit the vehicle and go back into foot pursuit [of Hensley].

{¶ 13} Trooper Parsons testified that once he exited his cruiser that he began issuing

commands for Hensley to stop. Trooper Parsons testified that Hensley "disregard[ed] those commands" and instead continued "to run on foot." Trooper Parsons testified that Hensley then went "up some steps behind The Village Pump," a local bar, towards "an apartment that sits above that bar." Trooper Parsons testified that Hensley then "continues into that apartment" and "disregards all of [his] commands." Trooper Parsons testified that Wilson then arrived at the scene driving her gray vehicle. When asked how long it took for Wilson to arrive back on the scene, Trooper Parsons testified, "[n]ot, not long, um, my estimation maybe five minutes at the most."

{¶ 14} Describing what Wilson did once she arrived at the scene, Trooper Parsons testified that Wilson "parks as if nothing is going on." Trooper Parsons then testified:

> Miss Wilson exits the driver's seat of the vehicle. Um, at this point I'm holding lethal cover on the door and the window making sure that [Hensley is] not going to come out and shoot at me or the patrons that are coming out to see what's going on from the bar. Um, I pivot to [Wilson], start giving her commands, show me your hands, which she did comply. She showed me her hands. I told her to stop. She didn't stop. She continued up into the apartment as well.

{¶ 15} Later describing this same event during his cross-examination, Trooper Parsons testified:

> [Wilson] exited the driver's seat of the vehicle, continued in front of me. I told her to show me your hands. She did. I told her to stop. We had an exchange of words. I don't remember what was said. Um, she continues up the steps and into the apartment.

{¶ 16} Trooper Parsons testified that Sergeant Ross, as well as other units, then arrived at the scene to provide additional support. Trooper Parsons testified that shortly after backup arrived that "the door to the apartment opens." Trooper Parsons testified that Wilson then ordered her son, Hensley, "who was our initial suspect, out of the dwelling." Trooper Parsons testified that he and Sergeant Ross then took Hensley "into custody, walk

him down the steps, place him in the patrol car and then we go back up, we arrest Miss Wilson." Trooper Parsons testified that Wilson was at this time "rather upset" with Hensley. Trooper Parsons also testified that Wilson was somewhat argumentative, "slightly resistant," "kind of fought back with her hands," and "kind of tensed up," when he and Sergeant Ross took her into custody and placed her under arrest.

*Wilson's Trial Testimony*

{¶ 17} Wilson testified that on the day in question, May 29, 2021, she received a telephone call from her son, Hensley, asking her to pick him up because whatever vehicle he was driving that day "kept messing up." Wilson testified that during this conversation there was nothing to indicate Hensley was "running from the law," or that Hensley was in any trouble whatsoever. Wilson also testified that she did not hear any sirens in the background. Wilson further testified that she did not find it odd that he wanted her to pick him up. So, because of this, Wilson testified that she and Hensley's girlfriend agreed to go pick Hensley up. Explaining what happened next, Wilson testified:

> Um, me and [Hensley's girlfriend] um, decided we was going to go pick [Hensley] up so, we was sitting there and we was facing like as you turn on the road, we was on the left hand side. And ah, I started hearing sirens, I was like what's going on. So, I done a U-turn, I was sitting on the left side of the road again, but up by the curve and I serious like trying to figure out what was going on. And we was just sitting there and [Hensley's girlfriend] brought a bubble [i.e., a pipe to smoke methamphetamine] with her, I'm going to be honest.

{¶ 18} Wilson then testified:

> Um, and [Hensley's girlfriend] started hittin it and I was, you know, I hit it once and we was just sittin there talking, you know just not even paying attention, but I was hearing sirens. I was trying to figure out what was going on. And we still conversatin (sic) and everything and next thing I know, I see a van just fly through and I'm like that's gonna be bad there's trees there, they aint even no road there. That's what I thought. I didn't even think there was any road there or anything.

{¶ 19} Wilson testified that she and Hensley's girlfriend "s[a]t there for a minute" before Hensley "runs up to the car" from "down the road a little bit" in the same vicinity that she had just seen a van "just fly through." Wilson then testified that as Hensley is getting into her car that "the trooper comes like, I thought he was going to T-bone me." Wilson testified that she was "freaking out" upon seeing Trooper Parsons' cruiser approach her vehicle, so she "just gassed it and I went to the stop sign," stopped, and then turned left. Wilson then testified:

> I went turned left and when we was getting up through there [Hensley] was like, "they're after me mom" and that's when I started flipping out on [Hensley]. I wasn't paying attention to my speed cause I was going off. And right before I turned to get to the, right where the bank is, to turn um, I made [Hensley] get out of the car. I stopped the car. I made him get out. I said you brought me into something.

{¶ 20} Wilson then testified that while Hensley was getting out of her car that she told him, "do not go to my house." Thereafter, when asked if, at that point, Wilson felt like she was being "chased" by the police, Wilson testified:

> No, I, I from the whole get go I never felt like I was being chased. Like even when I turned, I heard the sirens and everything but I was arguing with [Hensley] not paying attention to anything, you know what I mean? I'm beyond pissed now; you know what I mean? I'm sitting here telling [Hensley], "You know how can you bring me into this?" Because I'm going to be honest, I have a bad rep and I had my life together. I was the general manager of a store. I had a brand-new car. I had my life together.

{¶ 21} Wilson testified that once she realized the police were not following her vehicle anymore that she drove back to her apartment, which, as the record indicates, was the apartment located above The Village Pump. Wilson testified that once she got to her apartment that she realized Hensley had gone to her apartment because "the cops were standing there." Wilson testified that this made her "even pissed, more." Wilson testified that she then went upstairs to her apartment "to go get [Hensley's] ass out of [her] house."

Wilson then testified that it was never her intention at any time to help her son, Hensley, evade apprehension by the police.

*Jury's Verdict and Wilson's Sentence*

{¶ 22} Once both parties rested, and after the trial court denied Wilson's Crim.R. 29(A) motion for acquittal, the jury returned a verdict finding Wilson guilty as charged. The trial court then proceeded to sentencing. During sentencing, the trial court determined the offenses were allied offenses of similar import that would be merged for purposes of sentencing. The state then elected to proceed with sentencing Wilson on the failure to comply with an order or signal of a police officer charge. Following the state's election, the trial court sentenced Wilson to serve a 36-month prison term, less 61 days of jail-time credit. The trial court also ordered Wilson's driver's license be suspended for a period of ten years and notified Wilson that she would be subject to a mandatory three-year postrelease control term upon her release from prison. The trial court found this sentence was appropriate given Wilson's "twenty-year history of not only violation of the law but a complete disregard for authority in general and police officers in particular."

**Wilson's Appeal**

{¶ 23} Wilson now appeals the jury's verdict finding her guilty of failure to comply with an order or signal of a police officer, raising two assignments of error for review.[2]

{¶ 24} Assignment of Error No. 1:

{¶ 25} THE TRIAL COURT ERRED IN DENYING THE DEFENDANT-APPELLANT'S CRIM.R. 29 MOTION AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO FIND GUILT BEYOND A REASONABLE DOUBT IN VIOLATION OF

---

2. We note that, in her appellate brief, Wilson does not challenge the jury's verdict finding her guilty of obstructing justice. Therefore, we will limit our analysis to Wilson's conviction of failing to comply with an order of a police officer only.

HER RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 26} In her first assignment of error, Wilson argues the trial court erred by denying her Crim.R. 29(A) motion for acquittal on the failure to comply with an order or signal of a police officer charge. We disagree.

*Insufficient Evidence Standard*

{¶ 27} The standard of review for a denial of a Crim.R. 29(A) motion for acquittal is the same as the standard of review for a sufficiency of the evidence claim. *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 37. "Whether the evidence presented is legally sufficient to sustain a verdict is a question of law." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 9, citing *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, such as the case here, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. "The relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Roper*, 12th Dist. Clermont No. CA2021-05-019, 2022-Ohio-244, ¶ 39, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33.

*Failure to Comply with an Order or Signal of a Police Officer*

**{¶ 28}** As noted above, Wilson was convicted of failing to comply with an order or signal of a police officer in violation of R.C. 2921.331(B).  Pursuant to that statute, "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."  The term "willfully" is not defined within R.C. 2901.22, "which is the statutory provision that covers culpable mental states for criminal liability."  *State v. Cole*, 3d Dist. Seneca No. 13-10-30, 2011-Ohio-409, ¶ 22.  However, although not defined within R.C. 2901.22, under Ohio law, the term "willfully" is considered synonymous with the terms "purposely" and "intentionally."  *State v. Cantrell*, 10th Dist. Franklin No. 20AP-27, 2021-Ohio-180, ¶ 24.

**{¶ 29}** "'Purpose is defined in terms of a specific intention either to cause a certain result, or to engage in conduct of a certain nature regardless of what the offender intends to accomplish through that conduct.'"  *State v. Roberts*, 8th Dist. Cuyahoga No. 91086, 2008-Ohio-5750, ¶ 8, quoting 1974 Committee Comment to R.C. 2901.22.  Therefore, to secure a conviction for failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), the state must prove "the operation of a motor vehicle and the willful eluding or fleeing from a police officer after receiving a visible or audible signal to stop, a purposeful flouting of a police officer's signal and an attempt to escape."  *State v. McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, ¶ 21.

**{¶ 30}** To support her first assignment of error, Wilson argues her conviction for failing to comply with an order or signal of a police officer must be reversed because "the evidence she willfully, i.e., purposely, fled or eluded law enforcement is insufficient to convict her."  This is because, according to Wilson:

> it is only the events from the time the trooper rounded the bend

- 11 -

in the road and saw the minivan driver enter the grey car as a passenger, to the time the grey car let out the minivan driver where there is any state's evidence of Defendant-Appellant willfully eluding or fleeing.

{¶ 31} But, as a simple review of the record reveals, Wilson's summation of the evidence presented by the state leaves much to be desired. That is to say, contrary to Wilson's claim, the record contains more than enough evidence to support her conviction for failure to comply with an order or signal of a police officer. This includes the video footage of the incident taken from Trooper Parsons' cruiser camera, video footage that, as noted above, confirms Trooper Parsons' testimony that Wilson did not stop her vehicle when approached by Trooper Parsons' cruiser with his lights flashing and siren blaring. This video footage also confirms Trooper Parsons' testimony that immediately after Hensley got into Wilson's vehicle that Wilson "nearly struck [his] patrol car as she pulls away" from his cruiser at an "excessively fast" rate of speed.

{¶ 32} The video footage of the incident taken from Trooper Parsons' cruiser camera further confirms Trooper Parsons' testimony that he believed Wilson "was running from [him]." This was in addition to Trooper Parsons' testimony that "[t]his wasn't a situation where anybody in the public would have looked at that and said I wasn't in pursuit with that vehicle." Therefore, because the record contains more than enough evidence to support Wilson's conviction for failing to comply with an order or signal of a police officer, Wilson's first assignment of error claiming her conviction of failure to comply with an order or signal of a police officer was not supported by sufficient evidence lacks merit and is overruled.

{¶ 33} Assignment of Error No. 2:

{¶ 34} THE TRIAL COURT ERRED WHEN IT ENTERED A JUDGMENT AGAINST APPELLANT, WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 35} In her second assignment of error, Wilson argues her conviction for failing to

comply with an order or signal of a police officer was against the manifest weight of the evidence. We again disagree.

{¶ 36} Unlike a challenge to the sufficiency of the evidence, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34. To determine whether a conviction is against the manifest weight of the evidence, this court "must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34, citing *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. But, even then, the determination of witness credibility is primarily for the trier of fact to decide, not this court on appeal. *State v. Baker*, 12th Dist. Butler No. CA2019-08-146, 2020-Ohio-2882, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This court, therefore, "will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *Kaufhold*, 2020-Ohio-3835 at ¶ 10, citing *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶ 37} To support her second assignment of error, Wilson argues her conviction for failing to comply with an order or signal of a police officer was against the manifest weight of the evidence because "the evidence as the proof of 'fleeing or eluding' was negated by trial counsel's cross-examination and case-in-chief." In other words, Wilson argues her

conviction was against the manifest weight of the evidence because she testified that the only reason she "guns it" up the street immediately after her son, Hensley, gets into her vehicle is because she believes Trooper Parsons might "hit" her vehicle. However, when considering the jury's verdict, the jury clearly found Wilson's testimony as to why she sped away from Trooper Parsons immediately after Hensley got into her vehicle lacked credibility.

{¶ 38} Despite Wilson's claims, this finding was well within the jury's purview as the trier of fact and ultimate factfinder. *State v. Tenbrook*, 12th Dist. Butler No. CA2020-01-005, 2020-Ohio-5227, ¶ 27, citing *State v. Graffius*, 7th Dist. Columbiana No. 18 CO 0008, 2019-Ohio-4961, ¶ 11 ("[t]he jury was free to believe either version of the facts and, based on [a]ppellant's conviction, apparently believed the victim"). Therefore, because it is well-established that a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony, *see State v. Thomin*, 12th Dist. Butler Nos. CA2019-11-188 and CA2019-12-199, 2020-Ohio-4625, ¶ 19, Wilson's second assignment of error claiming her conviction of failure to comply with an order of signal of a police officer was against the manifest weight of the evidence also lacks merit and is overruled.

{¶ 39} Judgment affirmed.

M. POWELL, P.J., and BYRNE, J., concur.